Thank you, Your Honor. Good morning. May it please the Court, I'm Brendan Biffany from Robinson Bradshaw and Charlotte, and I represent the appellant, Bojangles' Restaurants. This is an interlocutory appeal under Rule 23F of a decision of the Western District of North Carolina granting certification of classes of Bojangles' Restaurants shift managers who assert violations of state wage and hour law. In granting class certification, the District Court abused its discretion in three key ways. First, it failed to conduct a rigorous analysis of the evidence the parties presented. Second, it misapplied the commonality standards set forth in Walmart v. Dukes. And third, it failed to conduct an analysis of whether the individual questions necessary to resolve the plaintiff's claims predominate over any common questions. Now, the Supreme Court in Walmart and Falcon and this Court in Ely v. Pinkerton Government Services direct that the District Court must conduct a rigorous analysis of the evidence to determine whether the Rule 23 requirements are met. The District Court failed to heed that instruction. Its brief discussions of commonality and predominance failed to cite to any record evidence that the parties submitted. And the parties submitted thousands of pages of evidence for the Court to consider. The opinion contains no discussion of the facts. And rather than examine the evidence, what the Court did was it accepted as true an allegation in the plaintiff's brief relating to Bojangles' opening checklist, which has defined no support in the record. There's no evidence to support that allegation. And based on that allegation, the Court found that the commonality and predominance requirements were met. And so by accepting as true the plaintiff's allegation without rigorously analyzing the evidence to determine whether it was supported, the Court impermissibly lowered the bar to obtain class certification to that of a pleading standard, which Walmart prohibits. I thought 80% of the putative class worked before opening without being compensated. So you said there's no evidence about – I think you mean literally the word checklist maybe weren't used. But isn't there ample evidence that there was work being done off the clock prior to the shift starting? So the individuals who claim that they performed work before their opening shifts without pay do not attribute that work to the opening checklist. No one testified that either, for example, their manager had said the opening checklist requires that we do this, or they point to the opening checklist as a reason for the work. And it is not correct that 80% of the class members claim that – Well, 80% of the respondents to the questionnaire. Correct. And those individuals represent only about 2% of the total class. And so I think that it's important to recognize what that evidence is in terms of a quantum and what it's not. It's a very small percentage of shift managers. Is 80% sufficient to establish commonality and predominance? That's a pretty high percentage. The evidence that those individuals who present show that they're asserting different claims, and that's true even for the pre-opening work, which is one of many forms of tasks that they allege that they performed off the clock. But 80% – your own expert report said 80% performed pre-opening work. 80% of the respondents said in their interrogatory responses that they did that. Now, Bojangles contests that that is accurate. However, the amount of evidence is one thing, but what those individuals say they did and why they say they did it is another thing. The plaintiffs have – I'm sorry, were you going to ask a question? Well, I always have questions. Why they said – wage and hour cases are not as clean as it seems like you want them to be. Typically, management doesn't announce to the whole staff, here's – you're going to work, and here's why, and here's the paperwork, and here's the email, and here's the policy. It's often difficult to get that type of evidence. And it seems to me that what the judge said was there is ample evidence in this record to establish that Bojangles has a policy of ignoring its policy. And there are other appellate courts, you'll agree, that have upheld that type of class. It seems like you're trying your case here like we're the jury. It's correct that there are very rare cases in which there's the type of smoking gun evidence that could be supporting an unwritten policy. In the absence of that type of evidence, the plaintiffs have to present anecdotal evidence that shows that there was a policy that affected them in a uniform manner and that it applied class-wide. Here, the plaintiff's evidence shows that they – not all of them worked opening shifts. Not all of them claim to have worked off the clock before their shifts. And so, for example, as to the opening checklist, any questions surrounding that could not resolve a central question to all the class members' claims at once. My guess to this is the checklist would seem to be pretty strong evidence as far as the pre-shift work is concerned because it reflects the company's expectations about what these individuals were expected to do. This is out of the company's own mouth and it details the different tasks that these individuals are expected to perform off the clock. So why doesn't – at least as far as the pre-shift members are concerned, and the pre-shift claims are concerned, why isn't that particular checklist persuasive evidence of commonality and indeed predominance? I'm not talking about the day, the run of the day. I'm not talking about the post-shift. But we don't always get evidence of commonality as clean as the checklist here. And why wouldn't that suffice to establish purely for the pre-shift class action status? The opening checklist states that shift managers are to drive through the parking lot while they note anything out of place for security purposes, park their car by the entrance of the restaurant, walk into the restaurant, disarm the alarm system, and clock in. No plaintiff has testified that they performed that work off the clock. I mean, no one is alleging that that is what my claim is. The individuals who assert that they did pre-shift work off the clock are presenting varied allegations for varied reasons, and no one ties it to the opening checklist, rather what the individual said. Well, that sounds to me like a de minimis argument. It is certainly a de minimis argument. All right, but if that's the case, wouldn't the de minimis argument be something for the district court perhaps to explore on remand to see if the pre-shift workers would be susceptible to a class? Had the plaintiffs alleged that that was the work that they performed, and had they said, this is a class about whether we were required to do that? I don't know what walking around the parking lot involves. It could be something that's 30 seconds. It could be more than that. But why wouldn't the de minimis argument be, I don't know enough about it, but the thing about the checklist is it does present management's view of what is required. And what I'm concerned about here, in the fast food business, assistant managers, they're about three levels down. They receive pretty decent salaries by and large, but they work very, very hard. And I don't want to get in a situation where we are authorizing companies and fast food companies to have workers perform tasks off the clock that are more than de minimis and for which they are not paid at all. That strikes me to go to the heart of the FLSA. And there's enough here to suggest that there's a policy as to the pre-shift, at least, that these workers are required to perform work and not get paid for it. And that's not good. I disagree that there is a policy that shows that these individuals and their claims— What does the checklist represent if it's not a policy? The checklist represents—I agree with you, what they're supposed to do when they come into the restaurant. But what the individuals in this lawsuit are claiming is not what the checklist is showing. What they're saying is that they did a variety of things inside the restaurant for a variety of reasons before they clocked in for their opening shifts. Many individuals testified that the reasons that they did this in their declarations, they say, my manager prohibited me from clocking in until 4 a.m. because that was the time that my shift started. Or they say 5 a.m. You agree that the checklist at least provides evidence that Bojangles acknowledges there is at least a task that needs to be performed when you're not being compensated, that being circling the parking lot. My issue is how is this different than the Bell case where there were tons of different PNC branches that were laid out, different asks, different tasks. Some were sitting at tables doing those— I always try to get the free T-shirt or whatever it is still. But everybody didn't perform the same task, but there was enough evidence there that tasks were being performed off the clock to tip the scales into finding that commonality. Here we have five or six different tasks, picking up products during the shift, coming in to obviously the opening checklist we've talked about and doing things before the clock, but we also have folks being asked to do other tasks. At what point does that click over into, you know what, you've created enough commonality here to send this to a jury. And I agree the timing is different, but that sounds like damages. So where's the line between PNC and what we have here? The Bell case is one of those cases that you had kind of referenced earlier. There was smoking gun evidence there that the individuals at the 27 branches that were certified, that's a very narrow class, in the Chicagoland area were subjected to a top-down common policy. They presented evidence from a supervisor that said, yes, PNC has these strict restrictions on what overtime can be recorded and that that causes people to work off the clock. They also presented plentiful evidence of internal investigations that PNC had performed in which the individuals alleged there was this policy, PNC acknowledged the policy, and PNC paid individuals as a result of those investigations for time work. The plaintiffs don't present any of that evidence here. Didn't plaintiffs try to get some evidence here and it was destroyed? I know that the sanctions aspect has not been decided, but it seems clear from the record that at least it's acknowledged that certain pieces of evidence just don't exist, whether that was intentional or whatever, for another day. The evidence that the plaintiffs say was destroyed relates solely to their time-shaming claim. It has nothing to do with their off-the-clock claims. That evidence was removed from Bojangles' systems prior to the time that they asserted a time-shaming claim in their Second Amendment complaint. But also, importantly, that evidence that they're complaining about is who made an adjustment to time and written time-edit authorization slips of whether a shift manager approved or disapproved an edit. There's an underlying question here, and that is, sooner or later, you've got to ask the question of whether the damages suffered were sufficiently similar as to lend themselves to a common calculation or whether the likely damages were so individualized that a common calculation would not be feasible. And the question I have is, can the question of damages and whether they suffice to establish a common calculation can that question be asked prior to the certification of a class? The damages question. Individualized damages inquiries would not preclude class certification. However, here, the variation in what individuals say they did, when they did it, why they did it, those are questions that are wrapped up in liability. Bojangles is not liable to any individual. And I see I'm running out of time. Okay, but if the tasks are individualized enough such that a common calculation of damages would not be possible, is that a question that can be addressed by a district judge prior to certification? I do believe that that is something that weighs in the calculation. In order to prove damages here, you would have to try out 5,000 separate individuals and have them testify. Can I have a direct answer to my question, please? I'm asking you whether the individualized, whether the question of how individualized the damage calculations are likely to be, can that question be addressed prior to the certification decision? Yes, Your Honor. I believe that the Supreme Court case, Amgen, I believe... Was this a Tyson Foods case or an Amgen case? I believe that Amgen precedes Tyson Foods. Tyson Foods relates to the use of statistical evidence. All right. But your point is that prior to the class certification decision, that the likely individualization of damages claims can be considered. Now, it's not by itself, may not be by itself reclusive, but it certainly, as I understand your position, it's certainly relevant. Yes, particularly here because the question of liability is inextricably intertwined with whether there are damages here. Bojangles is not liable to anyone who didn't work off the clock. Aren't the damages claims likely to be a lot more common for the pre-shift workers than for the damages stemming from the various different tasks performed during the day and post-shift? By limiting the case to questions surrounding opening shifts, it would necessarily make things easier from a damages perspective, but the variation in what people say they did, why they did it, whether their managers knew about it or not, would still cause substantial variation. You would not be able to present expert testimony, for example. Do you resist having a narrower class which took advantage of the, given the checklist and the evidence that that provides for commonality? Do you still object to class certification even for the pre-shift workers? Yes, Your Honor. But why? The evidence shows that no one attributes their pre-shift work to a common policy and there are individuals who say they did not work off the clock before their shifts. But the different tasks are ticked off, and if we completely denied class certification here, would we be giving our imprimatur to the fast food industry to just let workers perform all kinds of off-the-clock tasks for which they aren't being paid? I mean, if they do the work, they ought to be paid, right? I agree that if they do the work, they ought to be paid. Okay, and isn't there some evidence with respect to the pre-shift as to what the work is? That provides some of the commonality. To me, the pre-shift is a much stronger case for these, for your adversaries, than the duration of the day and the post-shift. I don't have enough information there to know what's going on, but you would agree that the claims for the post-shift are stronger than those for the duration of the day and for the post-shift. Or perhaps you're not going to give an inch. That's all right. It's your call. Necessarily, by limiting the scope of what the plaintiffs are trying to recover, they can create a closer relationship to commonality. But here, no one points to a common question that could be resolved on a class basis to even determine a common claim to pre-shift work. And so I agree with you completely that narrowing the class gives you a better chance, but the evidence here does not support it. But you're saying even that is not acceptable. Even that on these facts is not acceptable because there is a substantial number of people who allege or say they never worked off the bottom of their shifts. My response to you is if even that is not acceptable, I didn't want the decision to be read that we're green-lighting practices in the fast-food industry that require middle management to perform tasks for which they aren't compensated. I mean, it's pretty basic under the FLSA that if you perform a task and you do work, you should be paid for it. People don't work for free. And I'm wondering if we followed your lead and rejected class certification even for pre-shift claims, if we would be sending that kind of message. I believe you would be sending the message that in order to support a class action, the plaintiffs have to identify a common policy that applies to them all in a uniform way and that applies class-wide. And the plaintiffs have failed to present that evidence here. Okay. Thank you. Judge, did you want to answer? Judge, did you have some additional questions? Thank you. Okay. All right. Well, let's hear from the other folks. Ms. Gessner, we'd be pleased to hear from you. Thank you, Your Honor. May it please the Court, my name is Michelle Gessner, and I have the privilege of representing the plaintiffs' appellees today. Judge Cogburn's decision partially granting class certification of a North Carolina and South Carolina class should be affirmed by this Court, as it is not the product of any errors of law or clear errors in factual findings. This Court should affirm Judge Cogburn's decision because common issues surrounding Bojangles' systemic pay practices sufficiently eclipse any individualized claims, defenses, or damages. It's important in this case and in all cases to look at the standard of review and the deference given the Court. And as I heard the comments in the previous argument, Judge Cogburn here clearly has and has at all times had the full picture of the evidence in this case when he rendered his ruling. Is there a multidistrict, just as an informational matter, I would think these claims, this one's limited to North Carolina and South Carolina workers, but I would suspect that these claims are fairly common across the country. Is there a multidistrict panel that takes these sorts of claims up? There is not, Your Honor. These cases are typically brought as hybrid class collective cases, and that is this case. There is a collective action still pending before Judge Cogburn with 550, 520 opt-ins to date, and then there were other class actions for other states that were filed simultaneously in this case. Sorry to interrupt. I was just curious about that point. Playing this out, if the class was not certified but the FLSA collective continued, what's the difference in how the case proceeds and what it looks like towards the end? It seems like there's so much overlap there. Yes, Your Honor. Thank you for that question, which we do believe the class certification should stand, but in the event that it doesn't, the 550 collective members would still proceed to trial on their FLSA claims. What happens in these cases is the Fair Labor Standards Act only requires the payment of minimum wage, and what happens is companies then say, if you made $10 an hour, and, Your Honor, these people made $10 an hour. They were not salary. $10 an hour is a shift manager, and you go to trial in this case. The defendants then try to take a $2.75 credit when they get paid the $10 in order to cover the minimum wage that's owed. Same thing with an overtime calculation. So the collective action would proceed to trial on representative proof, in which the trial then would be conducted with selected witnesses, and as Your Honor— The class that's certified is a bit broad. It says all persons who worked as a shift manager at Bojangles in the state of North Carolina at any time from three years prior to the filing of this complaint, and that's fairly vague. And the question I had, particularly with the during-the-day activities and post-shift activities, would cover, it seems to me, a wide variety of activities. Some of them would be going—some of the managers would be going to other restaurants. Some of the managers would be going to make deposits at the bank. But they would be doing a variety of tasks, which required different amounts of time and the like. And doesn't the very variety of the task and the time that it took indicate that there's an individuality to the damage claims that a district judge was well advised to consider before certifying a class? Absolutely not, Your Honor, and let me address that. It is important that the common—one of the common questions is, does Bojangles have a written policy or an unwritten policy to cause shift managers to work without pay? And the statute is very specific. It isn't broad. It is narrow. In North Carolina, it is the failure to pay as promised. They promise they're going to pay for every minute of work. Where is the policy with respect—I understand the policy with respect to the pre-shift workers. Where is the policy? Yes, Your Honor, the pre-shift work, the opening checklist, is on its face evidence that Judge Cogburn chose to use as the low-hanging fruit to say it's a company policy that requires work for which is not compensated. But the fact that someone checks the parking lot before going to work is a very different question, is it not, from whether somebody is being compensated for going to another restaurant for whatever reason or visiting a supplier or going to a bank? It is not, Your Honor. They are all tasks for the benefit of Bojangles for which these people are not paid. So when Bojangles expects the shift manager to show up and go around the parking lot, pick up the trash, make sure everything's okay before they clock in—and let's talk about why they do that. It's free labor, because if they walk in the door and they clock in and then they go back out and do it, they would be paid for that time. When they show up and they do it before they get clocked in, that's free labor. Do you have anything comparable to a checklist or whatever that's reflective of a policy for the post-shift or during the day? There is some corporate evidence in this case, in addition to the abundance of evidence provided by the plaintiffs in this case, that Bojangles requires shift managers to work off the clock. But do you have anything as concrete as the checklist to make your point? There isn't a specific checklist for every single task, Your Honor, that would be as clear on its face. But under the Seventh Circuit case, the Bell case, and other case law, the abundance of people across store location, store sizes, management teams, all have given sworn testimony. My colleague here says it's often difficult to get that kind of evidence. But there are the various devices of discovery available to you. And I just want to know what in the way of e-mails, or it would seem to me there would be something that would be indicative of a policy for the post-shift and midday, let's call it, durations. What evidence is there of that that's comparable in concreteness to the checklist? In this case, there is evidence. When shift managers complained about not being paid for all hours worked to human resources, what HR did is sent it back down to operations to investigate it. The fox watching the hen house, Your Honor. So once it gets sent back down to the store to investigate, what would happen in reality is then that person would be taken to task for having complained about not getting paid. One of the things that is before this court as far as evidence is the company's handbook. So it's important to note that in the company's own handbook that it writes, there isn't a timekeeping policy specific to shift managers. It talks about crew members and it talks about managers in charge. But it doesn't say we will pay all shift managers for all hours worked. What the abundance of evidence provided by the plaintiffs to the district court, to Judge Cogburn, showed is that that seemed to be a get-out-of-jail-free card to operations to work these people for free. And, Your Honor, your concern about- I wish I had something more concrete. Let me give you another example. What I'm concerned about is that the variety of tasks and everything are going to lend themselves to very different damages calculations. And, Your Honor, let me address that question. Some people could be claiming four and five times as much. And a trial judge is supposed to consider or certainly can consider that prior to certification. May I address that question that you asked of my colleague? Tyson's Foods held expressly that class members with no injury does not defeat class certification. So with no damages, it does not mean that it cannot be certified. I'm sorry, but Amcham says it's possible to consider that. It is possible but not required, Your Honor. And here in this case, Judge Cogburn- It sure would be helpful, wouldn't it? Well, we disagree in the sense that you don't even get to damages if you don't succeed at trial on liability. Correct, Your Honor? And in this case, the pay rates in which that Judge Cogburn had as part of the clear picture showed that all these people made $10 an hour. We weren't talking about a variety of different wages. So if you look at the Monroe case out of the Sixth Circuit, it went to trial using hours only. So the jury only considered how many hours off the clock or how many hours of overtime was worked. And the judge did the math after the fact, did the damages. So damages, it's like the cart wagon, it's the tail wagon, the dog, Your Honor. Because if you look at the damages to decide that it should not go forth on certification, then any variety of damages are not even considered until after liability has been proven. But that's not inevitable. There's no prohibition. There is no prohibition, and that goes back to deference. Here, Judge Cogburn's deference- But there is no prohibition to considering the disparate nature of damages claimed prior to certification. I would respectfully disagree in the event if that is the sole reason in which a case were to be decertified or not certified is on damages, that that would be an error. Because the court is required to look at a common policy. Under the commonality, we've got the commonality and the predominance issue here, which is exactly what Judge Cogburn did. It is a low threshold. Brown v. Nucor says the commonality is a permissive standard and it is not a high threshold. And here, the common question that these parties rise and fall with is, does Bojangles have a written policy or an unwritten policy that causes shift managers to perform work off the clock? And Bojangles, if I'm right, has been throughout this litigation, which has lasted now three years, well, maybe even longer, actually. But they have throughout this said, no, we don't have that policy. They have not gotten into the weeds necessarily on damages except to try to disprove the policy. And they seem to have been saying, no, we don't have that policy. Would you agree that seems to lend itself to a common question because it's a common answer? Absolutely. If you go to trial and you don't have that policy, it's over. Absolutely, Your Honor. This is one of the cases in which the defense has been a common defense. It didn't happen. We pay everybody correctly. And, in fact, what we see in these wage and hour cases is often competing declarations. You've got declarations from the plaintiffs in testimony and you've got declarations from low-level management basically refuting the declarations. In this case, we don't have that. In this case, there is one senior operations person who did a declaration for Bojangles that says, none of this ever happens in our stores. So that common defense lends itself to the question. There's evidence, too. Like, for example, the alarm systems are not, I think it was 65% of the alarm systems are being turned off contemporaneous with the clocking in, which would seem to be strong evidence that people are being compensated for their time. And the jury will be able to consider that evidence in deciding liability. Judge Wilkinson, may I give you another concrete piece of evidence that's in the record to look at that you asked for, which is on the training report, JA3858. So Bojangles' corporate office requires that these shift managers go through online training in order to be shift managers. So they're paid as clerks until they get the promotion to $10 an hour. They are told that they have to do the training on their own time. That's in the record in the declarations. Bojangles' own records show that the training login is happening after the stores are closed. Often we ran a report of 11 p.m. to 5 a.m. Again, it's in the record that showed people logging into the corporate training system, doing the training, watching the videos, and taking the corporate tests. But you agree the judge didn't write about any of this? He did not. However, he wrote about the open checklist, and he checked through all of the ABCD on the superiority prong of Rule 23, which is what he is required to do. He analyzed the evidence. He saw that the open checklist was the one issue, which is all he's required to actually have for certifications at this stage of the case, and he used that as the example. But he did refer to the different levels, I'm sorry, the different standard under superiority. At what point in the case is the existence of the policy or the nonexistence of the policy? At what point is that to be decided? Yes, Your Honor. Because in other words, what you could have easily is a suit brought in which there is a conclusory allegation of a policy, and there's a conclusory denial of the policy, and you can't expect a company to say, oh, yes, we have that policy that's within their rights to deny it. So what you could do is there's the danger of having conclusory assertions of a policy and conclusory denials of a policy, and I'm not sure that that establishes commonality, and the question is at what point does that determination of whether there is or is not a policy, should that be made? Should that be made prior to the certification order? Well, Your Honor, respectfully, the court looked at, as it did here, the critical mass of evidence plaintiffs provided, which included sworn interrogatories. Defendants had the benefit during discovery of individualized discovery of all the FLSA collective members, 520 people. 401 people completed interrogatories that the defendants posed the question. The court had that critical mass of evidence to show that all but one, 400 out of 401, had been worked off the clock by Bojangles. So they had suffered or been permitted to work for which they were not paid. So is your position that that's just such a high number that it has to reflect a policy to disregard the policy? Absolutely, Your Honor, and again, it's not one rogue manager. They didn't make that defense, but the evidence didn't bear that out even. It was across their locations, across their stores, across their management. And there's well-established case law, particularly in other circuits, such as the Seventh Circuit, that that is enough. That is enough to bind this group together. So can I ask you about rigorous analysis that is required? Everyone agrees that this opinion that your adversary is claiming is woefully insufficient, and a lot of the facts you're citing to were not explicitly cited to. Is it your position that citing to your brief essentially unlocks all the other evidence? I'm also interested in your position on whether the contemporaneous summary judgment opinion that was issued that regarded FLSA claims but did some of the same analysis. Can the court consider that as it considers whether the judge did the rigorous analysis? Absolutely, Your Honor. In this case, there were competing summary judgment motions and there were competing certification motions. So the court had at its fingertips a significant record, in addition to having the fulsome of the record having been the judge on the case for so long. So we looked in every circuit for a particular case that said, if the court doesn't put it in its order, it did not conduct a rigorous analysis. And there isn't such an authority. As you said a moment ago in the prior case, what is in Judge Cogburn's mind when writing his order is what should be given deference here. And the assumption he didn't do a rigorous analysis because it's not written in the order is not the law. Well, my day job lends itself to, I love that idea that I can just think it and I don't have to write it. But unfortunately, you have to have a record for appeal. So I'm curious where that line is between just the assumption that the court considered it because it had to and what needs to be actually put in a written order. And we would say, again, the court, Bojangles takes at issue that the court states what the elements are for superiority and predominance. And then does it fully put an analysis? There is an analysis there. And again, that's why in our briefs we ask at the least, if you will, which we don't think it should go here. It would go back to the court for further. He says that 80% of the prospective class members say they worked an opening shift and worked off the clock. But then it says, and I think the district court indicated this, 20% of the class members never participated in any pre-shift labor. Is that correct? Your Honor, I think that that fills, that is their expert's analysis. And the court did put that in its opinion saying, well, then you concede that 80% did. And so, Your Honor, what I would say to that is, again, the common glue, the common theme, the common question here is, did Bojangles cause shift managers to perform work for which they were not paid? Do they have a policy that requires that, written or unwritten? But the very way you frame the question, did the policy require them to perform work, well, under that umbrella, there could be a great deal of difference in the work that is either required or the work that was performed or what have you, which leads me again to the question of, if there is going to be a wide variety of claims dealing with different tasks that people allege were performed off the clock, would it be advisable in order to avoid an administrative mishmash down the road when you come to the damages claim to decide the question of the commonality of the claims in terms of duration and nature of task performed prior to issuing a certification order? There doesn't seem to me to be any prohibition to considering whether the damage claims are sufficiently common or predominant prior to the certification. There's no prohibition. May I answer him out of time? Sure, go ahead. Your Honor, I respectfully disagree that that would be the appropriate way to even look at certification based on well-established precedents, because if you're looking at the differences in damages as opposed to the common question, it would be an opposite of what's required by Rule 23. Often Rule 23, most often, it's at the very beginning of the case or at the middle long before trial. In some cases, Rule 23 is certified and then discovery happens. So in this particular case, what I would impress upon the Court is that it is a red herring to even look at the various types of work that's been performed. It's all still work in which they were not paid. When you speak of have a policy, I mean, that hides an awful lot of questions. The question is policy with regard to which task, what policy with regard to, you know, in other words, the question as you framed it, do they have a policy of requiring workers to work off the clock? But that phraseology is so general because it could mean, I mean, a policy, how is the policy applied? To whom is it applied? To what task is the policy applied? I mean, I think that's what gives me a sense of unease, not with respect to the pre-shift workers because I think the policy with the checklist, which I think is a vital piece of evidence, is reduced to concrete tasks. But that same degree of concreteness is what makes me scratch my head on the daily tasks and the post-shift tasks because I don't know to what, if there is a policy, and that's a question, but if there is a policy, how is the policy applied? To what task? You know, to what group of workers? To what duration? You know, a policy is just so general. Your Honor, the case law states that the critical mass, the significant number of people in this case who are all testifying that they were required to perform work for Bojangles demonstrates the common policy or practice, and how is it then applied is your question. So I think that you're thinking more granularly than the law requires. Well, anything they ask them to, if it's go to the bank, if it's pick up buns, if it's to take people to and from work, they were asked to do work for the benefit of Bojangles to do whatever it took, and may I just for a minute tell you about these people? These people are often highly uneducated, entry-level managers that are hourly, in which a carrot is dangled that if you do what we ask you to do, you've got a management career at Bojangles. Look at their online materials. It says it. So they then use these people. I'm not saying that this can't be shown. I'm just saying I would have appreciated something more in the record showing it, because, you know, people get awfully conclusory about this kind of thing, and they say, oh, yeah, there's a policy, because why? They have every incentive to say, oh, yes, there's a policy, because at the end of the road lies some additional money. And so, you know, if I were asked, is there a policy that's preventing me from getting some more money, I'd say, sure, there's a policy. I mean, the incentives are all in favor of saying there's a policy, and that's why I think it would have been useful, just helpful to me, because I'm not against class certification, and FLSA suits, not for one moment, and I think that a class should be certified for the pre-shift, but to expand it over the rest of the day, it sure would have helped me to have reduced this to more concrete terms, other than saying, oh, yeah, yeah, there's this policy. And, of course, people are going to say there's a policy, because it means more money for them, and it might be that that policy can be proven. It might well be that everything you're saying can be proven. It just concerns me that the policy was not reduced to more concrete material. That's the question. May I please respond to that briefly? No, you can't. Thank you. Of course you can answer the question. I love to give litigants the last wordness, especially someone as able as you are, and I've appreciated your argument, but I don't understand why you won't give me more concrete evidence of the policy. Well, let me refer back to a question that Judge Hurson posed and asked, which is companies don't put in writing, do all this stuff off the clock. Again, it has to be the anecdotal critical mass evidence, because they're not going to say and say to the court, yeah, we try to get labor for free. And so Judge Cogburn raised, if you look at the hearing transcript on the certification motions, Judge Cogburn raised some of the concerns you raised, but he had the full, plentiful record in which to consider it, and Judge Wilkinson. Judge Cogburn, we all do this. If you are a parent, you do it. Happened to call you Judge Niemeyer. And Judge Cogburn is abundantly aware of class certification standard because he was the judge in Scott v. Family Dollar in which you wrote the dissenting opinion. And in that case, that's the discussion on the record where he was carefully weighing what did he have to do in order to certify this case or not certify it. No judge in their right mind wants to have a 5,000-person class action, but when the law requires it, that is what is required to do, and that's what Judge Cogburn did here. And I will tell you, Judge Cogburn is one of the very few judges, I'm not sure about you, Judge Hurston, so I hope I'm not being offensive, who has actually tried a 216-person off-the-clock collective action that had five state class action claims. We tried the case in one week. The jury deliberated for two days and rendered a very tempered verdict. I tell you that because he cites that case in his opinion, the Jehogadar case, and that is a case in which Judge Cogburn certified it. He was the judge on the discovery, and he was the trial judge. So he is fully aware of what the obligations are of the court and what they must consider in the rigorous analysis and would not have certified it if the law did not require him to do so. And so, again, if the court is unsatisfied with the judge's order, I'd ask you to send it back to him. I'm sure he'd be happy to rewrite it. But this case should stay certified under the North Carolina and South Carolina classes. And finally, he even was very restrained, if you will, in the certification. You started a question, Judge Wilkinson, well, shouldn't this be multi-district litigation? If they're doing it in North Carolina and South Carolina, aren't they doing it in all these other states? We agree with you. We filed class actions for each of the other states. The court denied those. So his certification opinion is incredibly well-analyzed, and I would ask that the court affirm it. Thank you, Your Honors. Let me ask my colleagues if they have further questions. Thank you very much. Thank you. Okay. I would like to make just a few points in response to what Ms. Gessner said. The first point would be that Bojangles does have a written policy to pay shift managers, all restaurant employees, for all the hours that they worked, and that all non-exempt employees will be paid overtime at time and hour. Of course they do. I mean, can you imagine if they had a policy that said anything else? Exactly. But she said that it doesn't have a written policy. They do. And pursuant to that policy, Bojangles paid shift managers during the class period 339,000 hours of overtime. Second. Well, I mean, that's fine, too. But I think the question is just abuse of discretion. If we go back to abuse of discretion, I'm curious on your views as to if we did find that the court looked at the evidence that you're discussing and your opposition counsel is discussing, how do we find abuse of discretion if we find that the judge did the proper analysis? Looking at the evidence is one thing, but applying the correct commonality standard and conducting a predominance analysis are another. And so here a material misapplication of the Rule 23 requirements is an abuse of discretion. So that's what we're saying here. That is the specific way in which the court. But you agree that the rules were laid out correctly, that the precedent was cited correctly, Walmart was cited, Rule 23 was cited. So you're sort of stuck with arguing that there was an error in the facts or? The court recited those standards. That is correct. However, look, for example, at its predominance analysis. The court in predominance said, yes, there are distinctions in the character of the plaintiff's claims. However, I find that they're all tied to a common policy. And so the claims predominate. That is the commonality standard. It's not the predominant standard. And so a material misapplication of a predominance analysis is an abuse of discretion. And then as to the commonality standard, the plaintiffs say that the common question here is, did Bojangles not pay shift managers for the time that they worked? That would require certification of every single wage and hour case, because in all cases they say that they've not been paid for the time that they worked. And that's much like in Walmart where the plaintiffs provided declaration evidence that they had been discriminated against in pay and promotion decisions. But Walmart's a Title VII case where the motive matters, and it's a case that's a nationwide class action for every single employee. In this case, it seems to me that throughout discovery it was narrowed down to really four or five different categories. We talked about pre-shift work. There's data reflecting a significant number of people did off-the-clock mandatory meetings, traveling to make bank deposits on the clock and not being, or rather off the clock, and training activities. What would be the harm in sending the case back, for example, to say, hey, can you clarify whether you find that these five or six particular categories should be certified? What's the harm in that? I don't think that, frankly, there would be harm in asking the district court to decide that. However, I believe that the district court did decide it. It said specifically, based on the opening checklist, all plaintiffs' claims are subject to certification. And so it made that determination already. And so I think that's a question that's been decided, and I think that that conclusion is incorrect. But he did specifically say all the claims are subject to certification. And the plaintiffs say that the way that they'll present this case is by selecting a representative sample of people. We'll pick some people, we'll put them up in front of a jury, and from that, a jury can decide did Bojangles have a policy or not. How else would, I mean, I don't know how else they would. Well, one way that you can do it is what happened in Bell, smoking gun evidence. The plaintiffs brought this case by alleging that Bojangles had strict labor budgets that required them to work off the clock. And so to the extent you could prove a commonly applied top-down policy like a labor budget, that's another way that materially advances the claims. Here, the evidence belied that. The name plaintiffs said, we blew labor every week. No, I understand. I guess I'm just sort of maybe obsessing over this question of why, and it's a payment case. And so the why doesn't matter except there may be a benevolent reason to not compensate workers. Maybe you want to throw an end-of-the-year party or something. I don't know. And you're saving for that. I think the point is just is there a common question, and it seems that 400 out of 401 respondents indicating that they were worked off the clock might generate a common question as to whether there's an overarching policy to work people off the clock. The reasons that they say they worked off the clock vary by person, and so that doesn't lend itself to a common determination. A common question is one that can be resolved using common proof. And plaintiffs here present no common proof. They say we're going to present individualized proof and ask you to infer a policy. The actual class certification adds to the concern that I have about the generality, that the terms policy and the like are thrown around. But the actual class certification reads like this. The North Carolina class, all persons who worked as a shift manager at Bojangles in the state of North Carolina at any time from three years prior to the filing of this complaint to the entry of judgment in this case. Well, so many class certification orders are written with more precision and detail than that. We're talking about a policy in a general manner, and then we're talking about a class certification order that's written at the highest level of generality. The only commonality is that you worked at Bojangles as a shift manager for three years. I mean, a lot of the class certification orders that I've seen, they break down the question as to exactly what the common question is with a degree of specificity. But here we're just talking about a general policy, and we've got a very general class certification order that says all you need to do is have work there. And that doesn't even identify the policy in the class certification. And so the question is from start to finish. I'm not in any way opposed to class certification, but I would have been helped immeasurably if the class certification order that defined the class said what the common questions were and addressed some of the questions of disparateness. Maybe there are subclasses or what have you, but it doesn't do that. And that, you know, talking about just policies without who they apply to or why they apply or what tasks they apply to or whatever and whose additional time amounts to overtime and who doesn't, the generality of the term policy is followed up by a highly general class definition, which just sweeps in. Talk about a class definition that just sweeps in and overlooks any kind of disparity or disparateness that may exist within the class. They're all dumped in a common bucket. Your Honor, the district court did not specify the common question because it could not do so while remaining faithful to Walmart. These are individuals who would require individualized testimony, individual mini-trials to prove their claims. And for that reason, the district court abused its discretion in certifying these classes, and we would ask you to reverse that decision. Thank you for your time today. All right. Are the questions okay? I'm good, thank you. All right. I want to thank both of you. I really appreciate the kind of preparation that each of you have devoted to this case, and we would like to really adjourn court, but we want to come down and say hi to you. But thank you both again. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Nicole G. Berner, Brendan A. Hurson